## ANDERSON v. GREAT EASTERN CASUALTY COMPANY

No. 2952.    Decided November 13, 1917.    (168 Pac. 966.)

1.  INSURANCE—HEALTH AND ACCIDENT INSURANCE—EXTENT OF LIA-
    BILITY.    Under health and accident policy providing that any loss
    resulting from septicemia should be regarded as resulting from
    sickness, and required a payment of only the sick benefit, the bene-
    ficiary could recover, for death of the insured from septicemia fol-
    lowing upon a sprained ankle, only the sick benefit for the period
    between the time of the injury and the date of death of the insured.
    (Page 82.)

2.  CONTRACTS—CONSTRUCTION.    In construing a contract, the true
    object is to arrive at the intention of the parties, to be ascertained
    by considering the object and purpose of the parties in making
    the agreement.    (Page 82.)

3.  CONTRACTS—CONSTRUCTION.    Where the parties make a clear and
    certain contract, the courts cannot do otherwise than apply and
    enforce its precise terms, regardless of whether they think the con-
    tract a good one.    (Page 87.)

McCARTY and GIDEON, JJ., dissenting.

Appeal from District Court, Third District; *Hon. T. D. Lewis,* Judge.

Action by Kate Anderson against the Great Eastern Casualty Company.

Judgment for defendant.   Plaintiff appeals.

AFFIRMED.

*Weber & Olson* for appellant.

*Hurd & Hurd* for respondent.

FRICK, C. J.

The plaintiff, as the widow of one Peter Anderson, brought this action against the defendant company to recover the amount stipulated in a certain policy of insurance which was issued by the defendant company and delivered to said Peter Anderson in his lifetime, and in which he was insured against loss by accidental death and also loss occasioned by sickness. It is not necessary to refer to the pleadings.

The policy of insurance sued on, and which is called an industrial policy, was produced in evidence.   We shall refer to such parts of the policy only as are deemed material to this controversy.

Section 1 provides for accident indemnities, and, so far as material, reads:

"Accident Indemnities.

"If any loss specified in this section shall result solely and exclusively from such injuries within three months from the date of the accident, the company shall be liable only for such loss and will pay for loss of life twelve hundred dollars. * * *"

Section 2 idemnifies against loss of time, and reads:

"Loss of Time—Total.

"If such injuries shall not result in any of the losses above specified, but shall from the date of the accident disable and prevent the insured from performing every duty pertaining

to any and every kind of business or occupation, the company will pay for such total disability, or a period not exceeding twenty-four consecutive months, indemnity at the rate per month of * * * $120.00.''

In that section provision is also made for partial loss of time. Section 3 provides for double indemnities in case injuries result under certain conditions.

Section 5 provides for indemnities in case of sickness as follows:

### ''Loss of Time—Confining Period.

''If any sickness, contracted and beginning after this policy has been in continuous force for 60 days, shall totally disable and prevent the insured from performing any and every duty pertaining to any and every kind of business or occupation and shall necessarily and continuously confine him within the house where he shall be regularly visited by a licensed physician, the company will pay for the period of such confinement after the first week and not exceeding six months, indemnity at the rate of $100.00.

### ''Loss of Time—Nonconfining Period.

''If immediately following such confinement or if by reason of any sickness so contracted the insured shall be totally and continuously disabled as above defined and regularly treated by a licensed physician but not necessarily confined within the house the company will pay, for the period of such disability after the first week and not exceeding four weeks, indemnity at the rate per month of $50.00.

### ''Full Indemnity for Boils, Felons, and Carbuncles.

''Full indemnity for loss of time from boils, felons, and carbuncles shall be paid regardless of confinement within the house.''

In the agreements attached to the policy, and which are made a part thereof, it is, among other things provided:

''6. Any loss resulting wholly or in part, directly or indirectly, from sunstroke, freezing, carbuncles, boils, felons,

abscesses, ulcers, blood poison or septicemia, contact with poisonous or infectious substances, lumbago, crick or lame back, or strain of the back shall be considered as resulting from sickness and covered only under section 5 of this policy, the original cause thereof notwithstanding.''

While there are many other provisions contained in the policy and in the agreements, yet the foregoing excerpts are sufficient to make clear the question that is presented for decision in this case.

At the trial, the evidence disclosed the following facts which are not disputed, namely:

''About 11 o'clock p. m., on the 1st day of November, 1913, approximately two years after the policy was issued, and while it was in full force and effect, the insured, Peter Anderson, near his home in Tooele, Utah, stepped on a cobble rock and sprained his left ankle. He arrived home a few minutes after the accident occurred, suffering intense pain from the injured ankle. His wife, plaintiff herein, treated the injury by rubbing the ankle and applying hot water and liniments thereon. Anderson suffered much pain during the night, and the next morning his left ankle and leg were much swollen. At this time neither Anderson nor his wife seemed to regard the injury as dangerous, and for several days thereafter continued to treat it by bathing it in hot water and applying liniments thereon. It gradually grew worse and more painful. About a week after the accident a doctor was called in to treat the injury. A week later the doctor called and found a slight abrasion in the injured ankle. On his next visit, which was about a week after the second—three weeks after the accident—the abrasion was larger and discharging pus. The doctor testified: 'There was an increase in the swelling and the whole leg became enormous; I couldn't handle it.' Mrs. Anderson testified, in part, as follows: 'I rubbed Snow liniment and other liniments on it, but mostly used hot water, * * * but it kept getting worse every day; it finally went into his knee. We didn't call the doctor before because we thought the ankle would get well soon. * * * We called Doctor Isgren in about a week after the injury. * * *

We didn't call the doctor before because we thought the ankle would get well soon.  *  *  *  We had bandaged the ankle before the doctor came.  *  *  *  About two weeks after the injury a sore was on the ankle bone and it broke; it was a bad looking sore.  *  *  *  He couldn't sleep night or day and the swelling finally went up into his body; up in his side. *  *  *  Mr. Anderson died December 13, 1913.' "

The evidence is clear and explicit that after Anderson was injured septicemia, or what is commonly called blood poison, supervened, and that he died from the effects thereof within about a month and a half after receiving the alleged injuries. The case was tried to a jury, and, upon the undisputed facts aforesaid, the district court directed a verdict for the defendant. Judgment was duly entered on the verdict and the plaintiff appeals.

The district court based its ruling entirely on the provisions contained in section 6 of the agreements, which we have set forth in full. Plaintiff's counsel vigorously assail the ruling of the district court, and insist that it erred in directing a verdict for the defendant.

The evidence leaves no room for doubt that blood poison set in some time after Anderson had been injured and had been treated for the injury. In arriving at a just conclusion in this case it is of the utmost importance that the foregoing fact be kept in mind, and that the provisions of   1, 2 the policy be considered in connection therewith. Another fact is equally important, and that is that the policy in question here was what may be termed a combination policy, covering losses sustained from both accidental injuries and from diseases, coupled with an express agreement that in case certain symptoms or ailments should manifest themselves, they, under all circumstances, should be considered as a disease. While it no doubt is true that all of the provisions contained in a policy must be looked to in order to determine the rights of the parties, yet, in this case, the provision which controls is found in section 6, to which special reference is again made. In that section, the parties to the contract have for themselves determined that in case certain symptoms or

conditions supervene they shall conclusively be considered and treated as diseases, regardless of what may have caused such symptoms or ailments. That is, the parties have agreed that certain symptoms or ailments which frequently have been the subject of disagreement and protracted litigation shall be treated as diseases, regardless of what may have caused them. The wisdom of specifically providing in the contract of insurance under what circumstances the policy shall be deemed to cover injuries due to accidents, and when certain ailments shall be considered as arising from disease, is amply established from the many cases in which the vexed question of what was the proximate cause of death has been considered. The following cases are a few of the many cases of that class, all of which are relied on by the plaintiff.

In *Industrial Mut. Ind. Co.* v. *Hawkins,* 94 Ark. at page 418, 127 S. W. at page 458 (29 L. R. A. [N. S.] 635, 21 Ann. Cas. 1029), the court states the question for decision thus:

"The sole question involved in the case for determination is whether or not, under the above provision of the policy, the plaintiff was injured to such an extent as to entitle him to a recovery. Upon that question the court instructed the jury that the plaintiff would be entitled to recover."

The policy in that case was limited to losses resulting from accidents. In *Continental Casualty Co.* v. *Colvin,* 77 Kan. 561, 95 Pac. 565, the only question was whether death resulted from the accident or from some other intervening cause. The same questions are involved in *Paul* v. *Travelers' Ins. Co.,* 112 N. Y. 472, 20 N. E. 347, 3 L. R. A. 443, 8 Am. St. Rep. 758, and in *Travelers' Ins. Co.* v. *Ayers,* 217 Ill. 390, 75 N. E. 506, 2 L. R. A. (N. S.) 168. In the case of *Allen et al.* v. *St. Louis Ins. Co.,* 85 N. Y. 473, the court passed on what was designated a "Uniform Canal Cargo Policy." The only question involved in that case was whether certain merchandise, while in transit on a particular canal boat between Troy, N. Y., and Philadelphia, Pa., was covered by the policy of insurance in question there. The court held that it was.

Even from the very brief statement we have made it is readily perceived why the courts in those cases had recourse to

the rules or canons of construction referred to therein. The rules or canons of construction followed in those cases are just, fair, and practical. They have stood every test to which they have been subjected during a great number of years. Those rules are so clearly, fully, and correctly stated in 1 Cyc. 243, that we take the liberty to quote the text in full:

"As a general rule the policy should be liberally construed, and the terms thereof should be understood in their plain, ordinary and popular sense. All provisions, conditions, or exceptions which in any way tend to work a forfeiture of the policy should be construed most strongly against those for whose benefit they are inserted, and most favorably toward those against whom they are meant to operate, this rule being applicable to purely benefit accident policies as well as to the ordinary accident policy, and any provision, condition, or exception which is uncertain or ambiguous in its meaning or is capable of two constructions should receive that construction which is most favorable to the insured. At the same time the language of the contract should be construed as a whole and should receive a reasonable interpretation, and it should not be extended beyond what is fairly within the terms of the policy; and the language of the provision, condition, or exception should, if possible, be given its legal effect."

The same language is repeated in 1 C. J. 414.

Let us now briefly refer to the provisions of the policy in question in the light afforded by the foregoing rules. Referring again to the case of *Industrial Mut. Ind. Co.* v. *Hawkins,* one of the primary rules of construction is stated in the first headnote thus:

"In construing a contract the true object is to arrive at the intention of the parties, to be ascertained by considering the object and purpose of the parties in making the agreement."

The rule is a most wholesome one, and is directly applicable to section 6 of the "agreements" contained in the policy in question here, which section we have heretofore quoted in full.

The question is pertinent, namely, What is the purpose of section 6, and what induced its adoption? To a large extent at least the question just propounded is answered by the cases above referred to, and by many others upon the same subject. The principal inducement for adopting section 6, no doubt,

was that it has become generally known that very slight injuries where the skin is broken or abraded may result in what is popularly called blood poison. It is also a matter of common knowledge that in case of accidental injuries blood poison very frequently supervenes as a result of carelessness or even from unscientific treatment. In case of accidental injuries, therefore, where blood poison supervenes, the question whether it resulted as a consequence of the accident or from carelessness, neglect, or some other independent cause constantly arises, and, as the courts resolve every doubt, whether of law or fact, in favor of the insured, one can readily understand why section 6 was incorporated into the character of insurance covered by the policy in question. It is quite apparent that it was for the purpose of eliminating all doubt respecting all accidents resulting in blood poison, whatever might be the cause producing blood poison. The premium of $2 a month was no doubt fixed in view of the limitations contained in section 6. It is however, contended that the language of section 6, when considered and construed in connection with the other provisions of the policy, is not free from doubt. If it were conceded that the language is not free from doubt, yet whatever doubt there may be, if any, in no way supports a contrary conclusion. The provision of section 6 which defines what the result shall be in case blood poison supervenes is entirely free from uncertainty or doubt. Under the provision of that section it matters not how, when, or from what source or cause, blood poison supervenes. If it supervenes at all it "shall be considered as resulting from sickness." Nor is there any doubt respecting the rights of the insured in case blood poison supervenes. When that result occurs, the insured receives the benefits provided for in case of sickness, for the reason that blood poison is, by the terms of the policy, to be considered sickness, and, as there stated, is "covered only in section 5 of this policy, the original cause thereof notwithstanding." This language admits of no construction. If blood poison is covered only by section 5, it cannot be covered by any other provision or clause of the policy. The insured is thus entitled to all the benefits provided for in section 5, as

in case of sickness. The cases before referred to, and other similar cases, and the reasons therein stated, therefore, have, and can have, no bearing on what the result should be in this case.

In order to arrive at an opposite conclusion, it must be assumed that there is doubt respecting the cause of Mr. Anderson's death. That is, that there is doubt whether Anderson's death was caused from disease which operated as an independent cause or whether it was the result of the accident. While there might be such a doubt if this were a case under the terms of an ordinary accident policy such as are usually involved, and such as were involved in the cases hereinbefore referred to, yet, under the provisions of the policy in question, no such doubt can possibly arise or exist. Here the parties, by their express agreement, have provided for such a contingency, and have entirely eliminated any question of doubt which might arise in that connection. The parties have solemnly stipulated that, in case blood poison should supervene in any accident, the injury, however caused, shall be treated as a disease, and that the insured shall be indemnified as provided for in case of sickness. Such are the express terms of their contract. They are bound by them, and so are the courts. We are thus prevented from mooting the question of whether the alleged accident was the proximate cause of Andersons' death, or whether he died from some intervening and independent cause. The rule, therefore, that in case of doubt respecting the cause of death the doubt may be resolved in favor of the insured has no application here. Under the policy in question there can be no doubt respecting the rights of the insured in case blood poison supervenes after an accident has occurred. In view of section 6 aforesaid, if blood poison supervenes the insured is conclusively deemed to be suffering from sickness, and he is indemnified in accordance with the provisions of the policy covering disease. In view therefore that blood poison supervened after Anderson received the injury complained of, the plaintiff's rights are controlled by section 6 aforesaid. The parties themselves have eliminated all question of doubt respecting that matter from the consideration of the courts

and expressly agreed that in case of an accident or injury and blood poison shall supervene the indemnity the insured is entitled to under the policy is for loss occasioned by sickness, and not for loss occasioned by the accident. Such are the terms of the contract, and until the same are assailed for some good and sufficient cause we are compelled to presume that Anderson fully understood them, and that he obtained precisely what he agreed to pay for.

Moreover, after Anderson and the defendant company had executed the contract of insurance they had the right—indeed, were bound—to assume that if any difference arose between them with regard to their respective rights under the contract the courts to whom their differences should be submitted would apply and enforce the precise terms of their agreement. It is therefore of no consequence whether in our judgment the terms of the policy are wise or unwise, whether they comport with our views respecting what an accident policy should or should not provide for, or whether we, or any one of us, would have agreed to the terms of the policy. Anderson, like all other individuals, had the right to determine for himself what kind of a contract he would enter into. That is a sacred right, and one we are bound to respect. When that right is once denied or ignored by the courts the only recourse of individuals is to resort to the primitive method of force.

The conclusion herein reached is supported by the decision of the Court of Appeals of New York in the case of *Schumacher* v. *Great Eastern, etc., Co.,* 197 N. Y. 58, 90 N. E. 353, 27 L. R. A. (N. S.) 480. If, therefore, we give full force and effect to the statements of the policy, as we are bound to do, but one conclusion is permissible, which is that the plaintiff cannot recover under the accident clause of the policy in question.

In view, therefore, that this action is based entirely upon the accident clause of the policy, and no recovery is sought for sickness, and the case having been tried upon that theory, the judgment of the district court is affirmed, with costs.

CORFMAN, J., concurs.

THURMAN, J. (concurring).

The policy in this case is declared to be an "industrial policy providing indemnity for loss of life, limb, limbs, sight or time by accidental means and for loss of time by sickness," to the extent provided in the policy. The policy was issued by the insurer and accepted by the insured "subject to all the agreements and limitations" therein contained. Among the "agreements and limitations" expressly set out in the policy is one which, so far as material here, is as follows:

"Any loss resulting wholly or in part, directly or indirectly, from   *   *   *   blood poison or septicemia   *   *   *   shall be considered as resulting from sickness and covered only under section 5 of this policy, the original cause thereof notwithstanding."

Section 5 referred to provides an indemnity of $100 per month for a period of not exceeding six months. The only question material to be considered here is, Did the loss for which idemnity is sought "result wholly or in part, directly or indirectly, from   *   *   *   blood poison or septicemia?" The uncontradicted testimony shows that blood poison was the immediate cause of Mr. Anderson's death. In fact, from the character of the injury received by him it is fair to presume if blood poison had not set in he would not have died from the injury at all. In the face of such evidence, and such provision in the policy, I am unable to reach any other conclusion than the one arrived at by the court below.

I concur in the opinion affirming the judgment.

McCARTY, J.

I dissent. This is an action to recover on an insurance policy issued to Peter Anderson, insuring him against accident and against loss of life by accident, in the sum of $1,200, which sum, it is alleged in the complaint, was payable to plaintiff, wife of Peter Anderson. After alleging the corporate existence of the defendant, and that it was, at the time the policy was issued and at the time this action was commenced, doing an accident insurance business in the State of Utah, plaintiff set forth in her complaint: (1) That on November 1,

1913, the said Peter Anderson accidentally stepped upon a cobblestone or some smooth or round object, and that his left foot slipped and his left ankle was then and there sprained, injured, and fractured, and that as a result of said injuries he died on or about December 13, 1913, and (2) that she is the widow of the said deceased and the beneficiary named in said policy; that she performed all of the conditions of said insurance on her part and gave due notice of the accident and of the death of the said deceased and furnished due and proper proofs thereof to defendant, and prayed judgment against defendant in the sum of $1,200. A copy of the policy is attached to and made a part of the complaint.

The defendant, by its answer, admits the allegations as to its corporate existence and the fact that it was doing business in the state of Utah; admits the issuance of a policy of insurance on or about November 21, 1911, to said Peter Anderson, a substantial copy of which, it is alleged, is set out in the plaintiff's complaint; admits that the plaintiff is the beneficiary named in said policy and the widow of said deceased; but denies generally each and every allegation contained in the said original complaint, and the said complaint as amended, not specifically admitted or denied in said answer.

The cause was tried to a jury. When the evidence was all in and both sides had rested, the court, on motion of counsel for the defendant, directed the jury to return a verdict for the defendant, "No cause of action." Plaintiff appeals.

The evidence, without conflict, shows that about eleven o'clock p. m., on the 1st day of November, 1913, approximately two years after the policy was issued, and while it was in full force and effect, the insured, Peter Anderson, near his home in Tooele, Utah, stepped on a cobble rock and sprained his left ankle. He arrived home a few minutes after the accident occurred suffering intense pain from the injured ankle. His wife, plaintiff herein, treated the injury by rubbing the ankle and applying hot water and liniments thereon. Anderson suffered much pain during the night, and the next morning his left ankle and leg were much swollen. At this time neither Anderson nor his wife seemed to regard the

injury as dangerous, and for several days thereafter continued to treat it by bathing it in hot water and applying liniments thereon. It gradually grew worse and more painful. About a week after the accident a doctor was called in to treat the injury. A week later the doctor called and found a slight abrasion in the injured ankle. On his next visit, which was about a week after the second—three weeks after the accident—the abrasion was larger and discharging pus. The doctor testified:

"There was an increase in the swelling and the whole leg became enormous; I couldn't handle it."

Mrs. Anderson testified in part as follows:

"I rubbed Snow liniment and other liniments on it, but mostly used hot water * * * but it kept getting worse every day; it finally went into his knee. * * * We called Doctor Isgren in about a week after the injury. * * * We didn't call the doctor before because we thought the ankle would get well soon. * * * We had bandaged the ankle before the doctor came. * * * About two weeks after the injury a sore was on the ankle bone and it broke; it was a bad looking sore. * * * He couldn't sleep night or day and the swelling finally went up into his body; up in his side. Mr. Anderson died December 13, 1913."

Blood poison finally developed, and a few days thereafter Anderson died.

The policy, which was issued November 21, 1911, and which is designated on the face thereof as an industrial policy, "providing indemnity for loss of life, limb, limbs, sight or time by accidental means and for loss of time by sickness," so far as material here, provides that the company—

"in consideration of the policy premium of $2.00 per month * * * hereby insures Peter Anderson * * * subject to all the agreements and limitations hereinafter contained, * * * against the effects of bodily injuries, caused directly, solely and independently of all causes by external, violent and accidental means (suicide, sane or insane excepted), which bodily injuries or their effects shall not be caused wholly or in part, directly or indirectly by any disease, defect or infirm-

ity, and which shall from the date of the accident result in continuous disability; and also against the effects of sickness, as follows:

"Accident Indemnities

"Section 1. If any loss specified in this section shall result solely and exclusively from such injuries within three months from date of the accident, the company shall be liable only for such loss and will pay for loss of life twelve hundred dollars, principal sum." [Then follows the amount of indemnity that will be paid the insured in case of the loss of one or more limbs, or the entire loss of the sight of one or both eyes.]

"Loss of Time—Total

"Section 2. If such injuries shall not result in any of the losses above specified, but shall from the date of the accident disable and prevent the insured from performing every duty pertaining to any and every kind of business or occupation, the company will pay for such total disability, for a period not exceeding twenty-four consecutive months, indemnity at the rate per month of * * * $120.00." [This section also provides indemnity for a partial loss of time for such injuries.]

Section 3 provides for double indemnity, providing such injuries shall be received while the insured is riding as a passenger in the inclosed part of any railway car, etc.

Section 4 provides for an increase of the amount of indemnities under section 1, after the payment of the third monthly premium.

"Sickness Indemnities

"Loss of Time—Confining Period

"Section 5. If any sickness, contracted and beginning after this policy has been in continuous force for 60 days shall totally disable and prevent the insured from performing any and every duty pertaining to any and every kind of business or occupation and shall necessarily and continuously confine him within the house where he shall be regularly visited by a licensed physician, the company will pay for the period of

such confinement after the first week and not exceeding six months, indemnity at the rate per month of $100.00.    *    *    * Full indemnity for loss of time from boils, felons and carbuncles shall be paid regardless of confinement within the house."

Section 6 provides that:

"The indemnities under sections 2 and 5 of this policy shall be increased ten per cent. if the premiums are paid annually in advance."

## "Agreements"

Paragraph 4 of the agreements provides: "In event of injury, fatal or otherwise, except drowning, of which there shall be no external and visible contusion or wound on the exterior of the body, the body itself in case of death not to be deemed such mark, or death, disability or loss due partly to injury and partly to disease or bodily infirmity, or due wholly or in part to or resulting directly or indirectly from injury intentionally inflicted upon the insured by any other person, unnecessary exposure to danger, riot, strike, evading arrest, gas, vapor, poison, injury inflicted upon the insured by himself or received by him while insane, or while under the influence of any intoxicant or narcotic, or while violating law, or the rules of a corporation, or the rules of a public carrier affecting the safety of its passengers, or while on the right of way, bridge, trestle or other property of a railway corporation other than stations, platforms and regular crossings prescribed by law, not being at the time a passenger or employee of such railway in the discharge of duty, or while or in consequence of being in or on or attempting to get in or out of any aerial machine or conveyance; or in event of disability resulting from rheumatism, paralysis, tuberculosis, sciatica, lumbago, hernia, dementia, insanity, venereal disease or chronic infirmity, then in any such case referred to in this paragraph the limit of the company's liability shall be a sum not exceeding one month's indemnity as provided in section 5 of this policy."

Paragraph 6 provides: "Any loss resulting wholly or in part, directly or indirectly, from sunstroke, freezing, carbuncles, boils, felons, abscesses, ulcers, blood poison or septi-

cemia, contact with poisonous or infectious substances, lumbago, crick or lame back, or strain of the back shall be considered as resulting from sickness and covered only under section 5 of this policy, the original cause thereof notwithstanding.''

It was contended in the lower court, and it is contended here on behalf of the respondent, that the death of Peter Anderson was due to septicemia or blood poison, and that the appellant cannot recover because the cause of death comes within paragraph 6 of ''Agreements.'' On the other hand, counsel for appellant contend that this paragraph has reference to injuries and bodily infirmities only which do not result in death. That is, they take the position that, in cases of this kind, where the insured is accidentally injured and the wound becomes infected and blood poison sets in that does not result in death, the injury and resultant disorders shall be deemed sickness, and recovery for loss of time shall be limited to six months and the indemnity to $100 per month. It will be noticed that paragraph 4 of ''Agreements'' provides that:

''In event of injury, fatal or otherwise, * * * or death, disability or loss due partly to injury and partly to disease or bodily infirmity, or due wholly or in part to or resulting directly or indirectly from injury intentionally inflicted upon the insured by any other person [specifying certain bodily infirmities and ailments, about 10 in number, and injuries inflicted by different means, about 16 in number], * * * then in any such case referred to in this paragraph, the limit of the company's liability shall be a sum not exceeding one month's indemnity as provided in section 5 of this policy''—namely, $100. Paragraph 5, consisting of four lines only, refers to matters not involved in the action. Then follows paragraph 6, under which respondent claims it is exempt from liability for the death of Anderson, the insured. Nothing is said of death in this paragraph, whereas the provisions of paragraph 4, in plain and unequivocal terms, provide that if death results from any of the kinds of accident therein mentioned the company's liability shall be limited to one month's

indemnity ($100), as provided in section 5 of the policy. In construing paragraph 6 of "Agreements," one should keep in mind section 5 of the policy which provides that:

"If any sickness, * * * shall totally disable and prevent the insured from performing any and every duty pertaining to any and every kind of business or occupation and shall necessarily ' and continuously confine him within the house * * * the company will pay for the period of such confinement *after the first week* not exceeding six months, indemnity at the rate per month of $100.00." (Italics mine.)

As stated, paragraph 6 of "Agreements" provides that "any loss resulting wholly or in part, directly or indirectly, from" any of the physical ailments or infirmities therein mentioned "shall be considered as resulting from sickness and covered only under section 5 of this policy." Now, section 5 covers and provides for the payment for loss of time only. No indemnity is therein provided for death under any circumstances. Therefore paragraph 6 should be construed the same as if it were incorporated in and made a part of section 5. The term "any loss," in paragraph 6, evidently refers to loss of time only, because section 5, under which such losses must be adjusted, refers to and deals with loss of time only. As herein pointed out, the policy provides that, in case of total disability resulting from accidental injury, the insured shall be paid a monthly indemnity at the rate of $120 per month "for a period not exceeding twenty-four months," and for total loss of time resulting from sickness the insured shall be paid a monthly indemnity at the rate of $100 per month for a period not exceeding six months, and for partial disability from sickness an indemnity of $50 per month for a period of time not exceeding four weeks.

It is generally, if not universally, known that the ailments and infirmities mentioned in paragraph 6 of "Agreements," none of which are necessarily fatal, often incapacitate the patient who may be afflicted with one or more of them from performing any kind of work or attending to business for a long period of time. The company, no doubt, having this in mind, by pharagraph 6, limited its liability to pay the insured

for loss of time in such cases to the smaller of the two classes of indemnity. The company having, in plain and unequivocal language in paragraph 4, expressly limited its liability in cases of death resulting from injuries caused by certain kinds of accidents and bodily infirmities, by classifying such injuries and infirmities as sickness, it may be fairly inferred that if the company had intended in paragraph 6 to classify as sickness injuries caused by accident that became infected with blood poison, and death results, it would have so stated in terms ordinarily plain and free from doubt. As pointed out, paragraph 4 provides that "in event of injury, fatal or otherwise, * * * or death, disability or loss due partly to injury and partly to disease or bodily infirmity," etc., the company's liability shall not exceed $100. In view of the plain and unmistakable language thus used in limiting the company's liability for death resulting from certain kinds of accidents, the writer is of the opinion that if the company intended in paragraph 6 to classify injury by accident when blood poison sets in, and death results, as sickness, it would have used the following language, or its equivalent, namely: "Any loss by death, or otherwise, resulting wholly or in part, directly or indirectly," etc. The language of paragraph 6, considered and construed in connection with the other provisions of the policy set forth in the foregoing statement of facts, is not free from doubt. It is a well recognized rule of law that when there is any uncertainty as to whether certain words or terms in an insurance policy were intended to be used in an enlarged or restricted sense, or the language used is otherwise susceptible of two constructions, the construction most beneficial to the insured will be adopted. *Industrial Mut. Ind. Co.* v. *Hawkins,* 94 Ark. 417, 127 S. W. 457, 29 L. R. A. (N. S.) 635, 21 Ann. Cas. 1029; *Continental Casualty Co.* v. *Colvin,* 77 Kan. 561, 95 Pac. 565; *Paul* v. *Travelers' Ins. Co.,* 112 N. Y. 472, 20 N. E. 347, 3 L. R. A. 443, 8 Am. St. Rep. 758; *Allen et al.* v. *St. Louis Ins. Co.,* 85 N. Y. 473; *Travelers' Ins. Co.* v. *Ayers,* 217 Ill. 391, 75 N. E. 506, 2 L. R. A. (N. S.) 168; 1 Cyc. 243; 1 C. J. 414.

In Richards on Insurance, page 111, the author says:

''The contract of insurance being a unilateral contract framed mainly in the interest of insurers, and the insured being compelled to accept the form offered, in order to secure insurance, any ambiguity as to purpose or meaning of its terms  *  *  *  will be construed in favor of the insured.'' [Citing *Matthes* v. *Imperial Acc. Ass'n*, 110 Iowa 222, 8 N. W. 484; *Janneck* v. *Met. Life Ins. Co.*, 162 N. Y. 574, 57 N. E. 182, and many other decisions by both state and federal courts.]

In construing the provisions of a written contract, the meaning of which is doubtful, it is well to keep in mind the relation of the parties to the contract, and the object sought to be accomplished by it. It is plain that the policy under consideration was intended to accomplish two purposes, namely (1) to indemnify the insured for loss, if any should result, from accidental injury, and (2) to indemnify the beneficiary in case the insured should, within a certain period of time, die from such injury.

As I have pointed out, paragraph 6 of ''Agreements'' provides, in part, that any loss resulting wholly or in part, directly or indirectly, from blood poison, lumbago, lame back, or strain of the back, etc., shall be considered as resulting from sickness. By giving this paragraph the construction contended for by respondent, namely, that there shall be no indemnity for death resulting from accidental injury where the wound becomes infected with septicemia or blood poison, or where one or more of the other ailments mentioned in the paragraph contributes directly or indirectly to the death of the insured, it necessarily follows that the company is practically immune from liability for death resulting from accidental injury, unless death occurs with the happening of the accident. It is a matter of common knowledge that a wound, not necessarily fatal, will ordinarily heal and the injured party recover, unless the wound becomes infected by poisonous bacteria entering it, and septicemia or blood poison sets in. Furthermore, under such circumstances, in cases where the injury is fatal and there is absolutely no chance for recovery if the wound becomes infected and septicemia or blood poison sets in, and death is thereby hastened and the life of the insured shortened by any appreciable length of time, if only for an

hour, no indemnity for death can be recovered, and if death shall occur within a week from the time of the accident no recovery at all can be had. As stated by counsel in their brief, a construction that will produce such unfair and unreasonable results will make of the policy a "fraud and a swindle." This, the inevitable conclusion regarding the unreasonableness of the policy if paragraph 6 shall be given the construction contended for by respondent, is not and cannot be overcome and explained away by the mere ipse dixit that it is "without merit."

To further illustrate the unconscionableness of the policy when so construed: Suppose a party carrying this form of accident policy is run down by a locomotive, street car, truck, automobile, or by a vehicle of any kind, or otherwise receives accidental injuries, some of which are necessarily fatal, and death occurs a short time thereafter; that one of the minor injuries received is a "strain of the back" which, in and of itself, is not fatal, but it, nevertheless, is shown to be a contributing cause of the death of the insured to the extent only of hastening it by an appreciable period of time; and, further, suppose a policy holder is stricken, but not fatally, with an acute attack of lumbago, and while so afflicted he is accidentally and fatally injured, and, in the course of three or four weeks thereafter, he dies from the injuries, and it is made to appear that while the lumbaginous affliction was not necessarily, or even probably, fatal, it was, however, a contributing cause of the death to the extent of bringing it on a few days, or, for that matter, a few hours sooner than it otherwise would have occurred. In either of the cases suggested the company would be liable for loss of time only as provided in section 5 of the policy, and, if death should occur within a week after the injuries were received, the company would not be liable for any sum whatever. It is a familiar rule of construction that where a contract is susceptible of two constructions, one of which makes the contract fair and reasonable, and the other makes it unfair and unreasonable, the former should be adopted. 2 Page, Contracts, Section 1121.

Attention is called by counsel for respondent in their

printed brief to the premium of $2 per month ($24 per year) paid by Anderson, and they refer to it as a cheap insurance. They then proceed to argue that because of this (alleged) low rate of insurance the company, by paragraphs 4 and 6, limited its liability for losses resulting from certain kinds of ailments and infirmities therein mentioned. The price of this kind of insurance ($2 per month) is also referred to in the opinion written by the Chief Justice, for the purpose of illustrating the alleged reasonableness of the policy as therein construed. The price paid by Anderson for the policy is not in controversy and hence is not relevant to any issue in the case. But since the question has been injected into the case for the purpose mentioned, and thereby given the same dignity as the material issues presented by the pleadings, I shall briefly refer to it.

The contract, as an accident insurance policy, is not at all attractive, even though it were construed so as to permit Mrs. Anderson to recover the death indemnity therein provided. Giving it the construction contended for by the company, as an accident policy it may well be characterized as a "swindle and a fraud," because, when so contrued, the insured does not get the protection against accidental injury which laymen of ordinary intelligence have a right to expect. That is in effect conceded. It has been suggested that "it may well be that Mr. Anderson expected more in case he was accidentally injured," than the infinitesimal amount, if anything, the company is willing to pay. Now, if Mr. Anderson did expect more—which I think he had a right to do—his expectation in that regard must have been created or induced by the terms of the policy as he understood them. If the policy is susceptible of a reasonable construction that would justify such expectation on his part—and I submit that it is—it should, under practically all of the authorities, be so construed. By giving the policy the construction contended for by the company, and then comparing it with accident insurance policies written by other companies, it might, and probably would, develop that instead of being a cheap policy, as suggested, it is, because of the restrictions and limitations therein provided, one of the most expensive and unsatisfactory accident policies offered

to the public.   In fact, when so tested, it might, and probably would, be found that as an accident insurance policy it is dear at any price, because such construction makes of the policy a most viciously deceptive and misleading one, especially to the ordinary layman.   It would tax to the utmost the ingenuity and legal acumen of an astute lawyer to draft a policy that would, upon a hasty and casual examination, such as laymen usually give contracts of this kind when entering into them, appear more plausible and fair to the insured on the one hand, and, on the other, impose less risk on the company issuing it, and give less protection to the insured for the premium paid, than the policy in the case at bar.   It is a safe prediction that the agents and solicitors of the company will, in the future, be able to induce but few, if any, people who familiarize themselves with this case, to accept this form of policy, notwithstanding the company may be represented as being, in a sense, a philanthropic institution, because it offers this kind of accident insurance to the public, and attention called to the fact that the policy, as judicially construed, is fair, just, and reasonable.

*Cary* v. *Preferred Accident Ins. Co.*, 127 Wis. 67, 106 N. W. 1055, 5 L. R. A. (N. S.) 926, 115 Am. St. Rep. 997, 7 Ann. Cas. 484, was an action on an accident insurance policy in which the beneficiary recovered judgment.   The policy insured Cary "against the effects of bodily injury caused solely by external, violent and accidental means."   The policy provided that "if death shall result from such injury within ninety (90) days from the date thereof, the company will pay the sum of $5,000" to the beneficiaries designated in the policy.   It also provided that:

"This insurance does not cover   *   *   *   any case of disability or death whatever, except where the claimant shall furnish to the company direct and positive proof that such disability or death resulted proximately and *solely* from accidental causes."   (Italics mine.)

The court, in the course of a clear, able, and well-considered opinion, says:

"There is no controversy but that Mr. Cary sustained an injury to his right leg which caused an abrasion of the skin, that bacteria, causing

septicemia or blood poisoning, entered his system through such abrasion, and that his death resulted therefrom.''

The court, after lucidly and somewhat elaborately discussing the meaning and application of the terms ''proximately and solely,'' as they are used in the policy, to which discussion we invite and direct attention, makes, among others, the following observations:

''The policy exempted the defendant from any liability for any injury 'resulting from any poison or infection, or from anything accidentally or otherwise taken, administered, absorbed, or inhaled.' Exemption from liability is claimed under this provision. * * * We have shown that the infection which produced the septicemia, which the jury found was the 'immediate cause' of death, cannot be held to be its proximate cause, and therefore it does not come within the terms of this exemption. * * * The facts as found exclude the idea that Mr. Cary was afflicted with any bodily infirmity or disease other than septicemia induced by bacterial infection entering through the abrasion of the skin. The exemption manifestly cannot apply to this bodily infirmity or disease, the result of the accident; for, if it were treated as within the exemption, *then it would be difficult to conceive of liability under any circumstances under insurance against effects of bodily injury caused solely by external, violent, and accidental means.* In the very nature of things, injury resulting from such an accident must be accompanied by some bodily infirmity in the general sense, and probably by disease in some form and degree, which in some measure contributes to the resulting disability or death.'' (Italics mine.)

And the court concludes:

''We are satisfied that the jury were well warranted in their conclusion that Mr. Cary's death resulted proximately and *solely* from his accidental falling on the floor.'' (Italics mine.)

The jury in that case found, and the court sustained the finding, that Cary's death resulted solely from the accidental injuries he received in his fall on the floor. Now, if the injury received—the abrasion of the skin—was the sole cause of death in that case, it necessarily follows that the sprained ankle in the case at bar was the sole cause of Anderson's death. And the weight of recent authorities is to the effect that where an injury is inflicted and other ailments, disorders, and infirmi-

ties resulting therefrom contribute in producing disability or death, the primary injury—the one first inflicted—is not only the proximate, but is, in law, the sole cause of such disability or death. To hold otherwise is to make the policy under consideration, and similar policies, a fraud on the public.

The case of *Continental Casualty Co.* v. *Colvin,* supra, was an action on an accident insurance policy which provided for indemnity in case the insured should die from accidental injuries. The policy, among other things, recited:

"(1) 'In the event that said insured, while the policy is in force, shall receive personal bodily injury, *which is effected directly and indirectly and independently of all other causes,* through external, violent and purely accidental means (suicide, sane or insane, not included), and which causes at once total and continuous inability to engage in any labor or occupation.'

"(2) 'If, within ninety days from the date of the accident any one of the following losses shall result necessarily and solely from such injury: [enumerating the losses.] * * * '

"(3) 'Where the loss is occasioned or *contributed to in any way by erysipelas, blood poisoning or infection;* then and in all cases referred to in this paragraph B of part III, the amount payable shall be one-fourth of the amount which otherwise would be payable under this policy.' " (Italics mine.)

In that case the insured was accidentally injured January 9th, and died March 7, 1905. At the time of the accident he was employed as a "boiler washer's helper" by a railway company and continued to perform his duties, with the exception of six days, until January 29th. On February 16th, the insured underwent an operation by which it was ascertained that his chest cavity contained an accumulation of pus which was liberated and the cavity drained. The physicians who performed the operation testified in part that "such pus was caused from pus producing germs; that the process by which these germs come in contact with the inflamed tissue is, or may be called, infection"; that "the inflammation and pus

present in the cavity contributed to some extent to the death of the insured.'' The company denied liability on the ground that the injury was one not within the terms of the policy for the reasons: (1) It did not cause at once total and continuous disability to engage in any labor or occupation; (2) that the death of the insured was not caused ''necessarily and solely from such injury''; (3) that ''death was caused in part by infection.'' On each of these propositions the court declined to follow the strict construction contended for by the company, and affirmed the judgment which was in favor of the plaintiff. Numerous decisions supporting the conclusions announced are cited in the opinion. The court, in the course of the opinion, says:

''It is further contended that the death of the insured was not caused solely by the injury, but resulted in part by infection, by pneumonia, and other causes which under the terms of the policy would prevent any recovery, or at least would reduce the amount which the beneficiary was entitled to recover to one-fourth of the principal sum named in the policy. And injury may be said to be the *sole* producing cause of death when it stands out as the predominating factor in the production of the result. It need not be so violent and virulent as to have necessarily and inevitably produced the result regardless of all other circumstances and conditions. The active efficient cause that sets in motion a train of events which bring about a result without the intervention of any force from a new and independent source may be regarded as the direct and proximate cause. If the immediate cause of death is a disease produced wholly by an injury, the death must be attributable to the injury and not to the disease. In this case, the insured was a strong young man in vigorous health at the time he received the injury, and his condition thereafter was clearly traceable to the injury as the effective and producing cause thereof; it must, therefore, be held that the injury was the *sole* cause of his death.'' (Italics mine.)

So, in this case, as hereinbefore stated, under the great weight of authority, the injury received by Peter Anderson, the insured, was, in a legal sense, the sole cause of his death.

In view that the judgment in this case is to be affirmed and the policy given a construction that makes it, in a moral and commercial, but not in a legal, sense, a cheat and a fraud, I submit that the defective state of our laws governing and regulating insurance companies that makes it possible for widows

and orphans to be thus defrauded should be called to the attention of the Legislature as provided by our Constitution (article 8, section 22). To send three-card monte sharks, promoters of pooling devices, of fake horse races, bunko steerers, and other professional crooks and grafters to the penitentiary for plying their trade, and permit an insurance company to defraud the public under the guise of honest business and fair dealing with the kind of insurance under consideration, is an unfair and unjust discrimination of the law against wrongdoers, especially in view of the fact that of the two classes of wrongdoers the insurance company is the more reprehensible, because the victims of the gamblers and professional crooks referred to are usually men who are generally, if not universally, in a certain sense wrongdoers themselves by becoming involved in the criminal transactions by which they are defrauded and robbed, whereas the victims of the insurance company are often, as in this case, either widows or orphan children entirely innocent of wrongdoing concerning the transactions by which they are ultimately made victims. And since the courts are unable, under the present state of the law, to give them the protection to which they are morally, but not legally, entitled, the Legislature will, no doubt, when its attention is called to the matter in the manner suggested, supply the needed legislation, and justice will no longer in this particular kind of a case remain in this state a delusion and a mockery.

GIDEON, J. (dissenting).

It is quite apparent from the policy in question in this action that it was the object and intention of the applicant, Anderson, to provide for the payment to his beneficiary, in the event of his death by accident, of the amount provided for and stipulated in such policy. The policy purports to be an "industrial policy providing indemnity for loss of life, limb, limbs, sight, or time by accidental means and for loss of time by sickness." Two distinct elements of loss are mentioned in the caption of the policy. If the construction contended for

by the company is to be adopted, then I submit that the provisions of section 6 of the "agreements" nullify not only the spirit, but to a large extent, the provisions of the contract in the policy, wherein it is provided that the insurance is against the effects of bodily injuries, etc.   It is provided in said section 6 that "strain of the back shall be considered as resulting from sickness," and if a man dies from blood poison induced by injury, and is not permitted to recover, it would be just as logical to hold that if the insured had fallen from the front steps of the Capitol building and severely strained his back, and that thereafter, within two days, as a result of such strain he had died, his beneficiary could not recover because "strain of the back" is to be construed as sickness and not as an accident.   No such limitation upon the right to recover was ever in the minds of the parties at the time the policy was issued.

In *Jennings* v. *Brotherhood Acc. Co.*, 44 Colo. 68, 96 Pac. 982, 18 L. R. A. (N. S.) 109, 130 Am. St. Rep. 109, it is said:

"The intention of the parties to a contract of insurance is indemnity, and this intention is to be kept in view and favored in construing its provisions.   Having indemnity for its object, a policy of insurance is to be construed liberally to that end, and for this reason conditions and provisos therein will be strictly construed against the insurers, because their object is to limit the scope and defeat the purpose of the principal contract."

See, also, 2 Elliott, Contracts, section 1508.

The construction of section 6 of the agreements attached to the policy in question here contended for by Mr. Justice McCARTY, in my opinion, gives effect to all of the terms of the policy, whereas, as I view the matter, any other construction will, in a measure, render the provisions of the policy under the accident indemnities nugatory and of no effect.

I therefore join Mr. Justice McCARTY in his dissent.